DAVID T. MALOOF (DM 3350)
THOMAS M. EAGAN (TE 1713)
MALOOF BROWNE & EAGAN LLC
411 Theodore Fremd Avenue, Suite 190
Rye, New York 10580-1411
(914) 921-1200
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| NIPPONKOA INSURANCE COMPANY LIMITED, | : |
|  | :   **07 Civ. 10498 (DC)** |
|          Plaintiff, | : |
|   - against - | :   **PLAINTIFF'S RESPONSE TO** |
|  |   **DEFENDANTS' STATEMENT OF** |
| NORFOLK SOUTHERN RAILWAY | :   **MATERIAL FACTS PURSUANT** |
| COMPANY and THE KANSAS CITY |   **TO LOCAL RULE 56.1 AND** |
| SOUTHERN RAILWAY COMPANY, | :   **COUNTER-STATEMENT**_____ |
|  | : |
|          Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff NipponKoa Insurance Company Limited ("NipponKoa") responds to Defendants' Statement of Material Facts Pursuant to Local Rule 56.1, and submit their Counter-Statement.

1.      Plaintiff NipponKoa Insurance Company Limited ("NipponKoa") is an insurance company organized and existing under the laws of Japan, with its principal place of business in the United States in New York, New York, and is the insurer, indemnitor, subrogee and/or assignee of the Shipments that are the subject of this action, as more fully described below. Plaintiffs' Amended Complaint ("Complaint") at ¶ 2.

**Response:** Not disputed.

2.      Defendant Norfolk Southern Railway Company (hereinafter "Norfolk Southern" or "Defendant") is a corporation organized and existing under laws of Virginia, was and is doing

business as a common carrier of goods by rail for hire and was the delivering rail carrier of the Shipments at issue. Complaint at ¶ 3.

**Response:** Not disputed.

3.    The Kansas City Southern Railway Company (hereinafter "KCSR" or "Defendant") is a corporation organized and existing under the laws of the state of Missouri, was and is doing business as a common carrier of goods by rail for hire, and was a rail carrier of the shipment at issue. Complaint at ¶ 4.

**Response:** Not disputed. For sake of completeness, the derailment occurred on a KCSR line.

**[Enplas Shipment]**

4.    On or about March 31, 2006, at the Port of Tokyo, Japan, there was shipped by ENPLAS Corporation. ("ENPLAS") of Saitama, Japan and loaded aboard the M/V Cherokee Bridge a consignment of Plastic Automotive Parts, in Container YMLU4361427 (the "Auto Parts Shipment"). The Auto Parts Shipment was discharged at the Port of Long Beach, California and thereafter to rail carriers for rail transport. See ENPLAS Auto Parts Bill of Lading, attached as Exhibit A to the Declaration of Alfonso Gambone In Support of Defendants' Motion for Summary Judgment ("Gambone Declaration"); Complaint at ¶ 6.

**Response:** Not disputed.

5.    ENPLAS manufactured the Auto Parts at its factory located in 7-2, Satsuki-cho, Hanuma-Shi, Tochigi, Japan. See Plaintiff's Declaration of ENPLAS Corporation pursuant to F.R.E. 902 ¶ at 1, attached as Exhibit N to Gambone Declaration. All inspections of the Auto Parts occurred before the Auto Parts left the factory in Tochigi, Japan which is approximately 140 km from Tokyo. See Website Excerpt regarding Tochigi, Japan, attached as Exhibit P to

Gambone Declaration1 and Plaintiff's Declaration of ENPLAS Corporation pursuant to F.R.E. 902 at ¶ 3, attached as Exhibit N to Gambone Declaration.

**Response:** Disputed as follows: the cargo was packed to withstand the normal rigors of transit (Ex. N to Gambone Declaration, par. 5) and that the goods set forth in the invoice and packing list (attached as Ex. A to the Kasmatsu Declaration) were packed into Container YMLU 4361427 (see Ex. B to Kasamatsu Declaration).   Also, the shipment is inspected during loading into the containers and set aside if damaged (Ex. 1, Kasamatsu Dec., par. 3).

6.    Yang Ming Marine Transport Corp. (Yang Ming) issued a separate sea waybill for the container which made up the Auto Parts Shipment ("Yang Ming Auto Parts Waybills"). The Yang Ming Auto Parts Waybills identified Tokyo, Japan as the "port of loading" and Atlanta, Georgia as the "place of delivery." See Yang Ming Auto Parts Waybill, attached as Exhibit B to Gambone Declaration.

**Response:** Not disputed.

7.    Norfolk Southern generated waybills for the rail transport of the container which made up the Auto Parts Shipment ("NS Auto Parts Waybills"). The NS Auto Parts Waybills identifies Long Beach, California as the rail origin and Austell, Georgia as the rail destination. The NS Auto Parts Waybills also indicate that the Auto Parts Shipment was originally tendered for rail transport to the BNSF Railway in Long Beach, California and then interchanged with Norfolk Southern in Dallas, Texas. See NS Auto Parts Waybill, attached as Exhibit C to Gambone Declaration.

**Response:** Not disputed.

8.    NipponKoa insured the Auto Parts Shipment. Complaint at ¶ 2.

**Response:** Not disputed.

9.      ENPLAS executed a "Subrogation Receipt" in exchange for the payment of insurance proceeds by NipponKoa, for claims related to the Auto Parts Shipment. ENPLAS agreed to "render all reasonable assistance in connection with any actions or proceeding undertaken" related to this matter. See the Subrogation Receipt of ENPLAS, attached as Exhibit D to Gambone Declaration.

**Response:** Disputed.  Enplas issued the subrogation receipt to its underwriters, TM Claims Services (Ex. 6 to Eagan Dec.).  TM Claims Services in turn made claim on Nippon Express, the freight forwarder who issued a bill of lading to Enplas (Ex. A to Gambone Dec.). NipponKoa insured Nippon Express, and paid $100,000 on behalf of Nippon Express to TM Claims Services in settlement, and received an assignment from TM Claims Services (Exs. 7 and 8).  Plaintiff refers to the terms of Exs. 7 and 8.

10.      In response to Defendants' notice of deposition pursuant to Fed. R. Civ. P. 30(b)(6)2, plaintiff did not designate or produce anyone to testify as to the condition of the Auto Parts Shipment inside the containers either at origin or when it was tendered for domestic rail transportation to BNSF and Norfolk Southern. See excerpts from the Deposition of Brian W. Daugherty, 47:15 – 48:1-11, attached as Exhibit E to Gambone Declaration.

**Response:** Disputed as follows:  Neither plaintiff nor its assureds had a witness on the scene at the time the shipment was tendered to BNSF or Norfolk Southern.  That information was not known or reasonably available to plaintiff, and therefore plaintiff could not produce such a witness for deposition.  However, plaintiff disclosed the existence of Yang Ming in its Initial Disclosures regarding the delivery of the shipment for rail carriage and cargo condition (Ex. N to Gambone Declaration, p. 2).  Defendants were certainly aware of BNSF from the Initial

4

Disclosures in the related *Sompo* case (Ex. E to Howard Dec.).  Moreover, in response to subpoena, Yang Ming confirmed that the Enplas container had not been involved in any incident from the time of delivery to Yang Ming in Japan until the derailment (Ex. 3, Williams Dep., Tr 8-9).  Moreover, the undisputed evidence adduced during discovery shows that the goods were in good order and condition in that (i) the goods were in good order and condition on leaving the factory; (ii) the goods were packed to withstand the normal rigors of transport; (iii) that there were no transportation events involving the cargo (other than the derailment); (iv) no exceptions were taken to the condition of the containers or their contents at point of rail carriage; (v) the derailment was not caused by inherent vice or act of shipper; (vi) that the derailment severely damaged the 40-foot containers in which the Shipment was carried; and (vii) from the type of damage it is self-evident the damaged condition resulted from the derailment.  Plaintiffs incorporate by reference their Rule 56.1 Counter-Statement below, pars. 1-16, with referenced Exhibits therein.

11.    Plaintiff disclosed no information whatsoever during discovery concerning the condition of the Auto Parts Shipment inside the containers when it was tendered for domestic rail transportation to the rail carrier in Long Beach, California. See Plaintiff's Supplemental Responses to Defendants Requests for Admission, Response No. 2, attached as Exhibit K to Gambone Declaration.

**Response:** Disputed.  Plaintiffs' specifically denied that request.  The undisputed evidence adduced during discovery shows that the goods were in good order and condition in that (i) the goods were in good order and condition on leaving the factory; (ii) the goods were packed to withstand the normal rigors of transport; (iii) that there were no transportation events involving the cargo (other than the derailment); (iv) no exceptions were taken to the condition of

the containers or their contents at point of rail carriage; (v) the derailment was not caused by inherent vice or act of shipper; (vi) that the derailment severely damaged the 40-foot containers in which the Shipment was carried; and (vii) from the type of damage it is self-evident the damaged condition resulted from the derailment. Plaintiffs incorporate by reference their Rule 56.1 Counter-Statement below (pars. 1-16 with referenced Exhibits).

12.    Plaintiff has never disclosed the identity of any individual with knowledge of the condition of the Auto Parts Shipment at rail origin, nor has plaintiff produced any evidence of any inspection of the freight inside the containers when the containers were tendered for domestic rail transport. See Plaintiff's Rule 26(a) Initial Disclosures at ¶ 1 – A, attached as Exhibit L to Gambone Declaration.

Response: Disputed. Plaintiffs' Initial Disclosures identified Yang Ming (Ex. L to Gambone Declaration). Moreover, defendants were well aware from the Initial Disclosures in the related *Sompo* case of the existence of BNSF on this subject (Ex. E to Howard Dec.). Yang Ming was subpoenaed and confirmed there were no other incidents involving the cargo other than the derailment (Ex. 3, Williams Dep., Tr 8-9).

**[OOZX Shipment]**

13.    On or about March 29, 2006, at the Port of Nagoya, Japan, there was shipped by Fuji OOZX, Inc. (OOZX) and loaded aboard the M/V Cherokee Bridge a consignment of Engine Valves, in Container TEXU4763735 (the "Engine Valve Shipment"). The Engine Valve Shipment was discharged at the Port of Long Beach, California and thereafter delivered to Norfolk Southern for rail transport. See OOZX Engine Valve Bill of Lading, attached as Exhibit F to Gambone Declaration.

Response: Not disputed.

14.    OOZX manufactured the Engine Valves at its factory located in 1500-60, Misawa, Kikukawa City, Shizuoka, Japan. See Plaintiff's Declaration of Fuji OOZX, Inc. pursuant to F.R.E. 902 ¶ 1, attached as Exhibit O to Gambone Declaration. All inspections of the Auto Parts occurred before the Auto Parts left the factory in Shizuoka, Japan which is approximately 200 km from Tokyo. See Excerpt from Website regarding Shizuoka, Japan, attached as exhibit Q to Gambone Declaration3 and Plaintiff's Declaration of ENPLAS Corporation pursuant to F.R.E. 902 at ¶ 3, attached as Exhibit O to Gambone Declaration.

**Response:** Disputed as follows: the cargo was placed into the container in good order and condition (Ex. O to Gambone Declaration, par. 5); and that the goods were all inspected and found in good order and condition; the shipment was inspected while being loaded into the container; and the goods were packed to withstand the normal rigors of transit (Ex. O, pars. 3, 4 and 5; Ex. 10, Daugherty Dep, Tr 20-21; Ex. 9, Survey Report at p. 182).

15.    Yang Ming issued a separate sea waybill for the container which made up the Engine Valve Shipment ("Yang Ming Engine Valve Waybills"). The Yang Ming Auto Parts Waybills identified Nagoya, Japan as the "port of loading" and Atlanta, Georgia as the "place of delivery." See Yang Ming Engine Valve Waybill, attached as Exhibit G to Gambone Declaration.

**Response:** Not disputed.

16.    Norfolk Southern generated waybills for the rail transport of the container which made up the Engine Valve Shipment ("NS Engine Valve Waybills"). The NS Engine Valve Waybills identifies Long Beach, California as the rail origin and Austell, Georgia as the rail destination. The NS Engine Valve Waybills also indicates that the Engine Valve Shipment was originally tendered for domestic rail transport to the BNSF Railway and then interchanged with

Norfolk Southern in Dallas, Texas. See NS Engine Valve Waybill, attached as Exhibit H to Gambone Declaration.

> **Response:** Not disputed.

17.    NipponKoa insured the Engine Valve Shipment Complaint at ¶ 2.

> **Response:** Not disputed.

18.    OOZX executed a "Subrogation Receipt" in exchange for the payment of insurance proceeds by NipponKoa to its insured for claims related to the Auto Parts Shipment. ENPLAS agreed to subrogate "all … rights of recovery … from the carriers … liable .. and assist you in effecting such recovery." See the Subrogation Receipt of OOZX, attached as Exhibit I to Gambone Declaration.

> **Response:** Not disputed, but for sake of completeness Plaintiff refers to the entire document.

19.    In response to Defendants' notice of deposition pursuant to Fed. R. Civ. P. 30(b)(6)4, Plaintiff failed to designate or produce anyone to testify as to the condition of the Auto Parts Shipment inside the containers either at origin or when it was tendered for domestic rail transportation to BNSF or Norfolk Southern. See Excerpts of the Deposition of Peter Widmer, 48:14 – 50:6, attached as Exhibit J to Gambone Declaration.

**Response:** Disputed as follows:  Neither plaintiff nor its assureds had a witness on the scene at the time the shipment was tendered to BNSF or Norfolk Southern.  That information was not known or reasonably available to plaintiff, and therefore plaintiff could not produce such a witness for deposition.  However, plaintiff disclosed the existence of Yang Ming in its Initial Disclosures regarding the delivery of the shipment for rail carriage and cargo condition (Ex. N to Gambone Declaration, p. 2).   Defendants were certainly aware of BNSF from the Initial

Disclosures in the related Sompo case (Ex. E to Howard Dec.).  Moreover, in response to subpoena, Yang Ming's attorney confirmed that the Enplas container had not been involved in any incident from the time of delivery to Yang Ming in Japan until the derailment (Ex. 3, Williams Dep., Tr 8-9).  Moreover, the undisputed evidence adduced during discovery shows that the goods were in good order and condition in that (i) the goods were in good order and condition on leaving the factory; (ii) the goods were packed to withstand the normal rigors of transport; (iii) that there were no transportation events involving the cargo (other than the derailment); (iv) no exceptions were taken to the condition of the containers or their contents at point of rail carriage; (v) the derailment was not caused by inherent vice or act of shipper; (vi) that the derailment severely damaged the 40-foot containers in which the Shipment was carried; and (vii) from the type of damage it is self-evident the damaged condition resulted from the derailment.  Plaintiffs incorporate by reference their Rule 56.1 Counter-Statement, pars. 17-29, with referenced Exhibits therein.

20.    Plaintiff disclosed no information whatsoever during discovery concerning the condition of the Engine Valve Shipment inside the containers when it was tendered for domestic rail transportation to the rail carrier in Long Beach, California. See Plaintiff's Supplemental Responses to Defendants Requests for Admission, Response No. 4, attached as Exhibit K to Gambone Declaration.

**Response:** Disputed.  Plaintiffs' specifically denied that request.  The undisputed evidence adduced during discovery shows that the goods were in good order and condition in that (i) the goods were in good order and condition on leaving the factory; (ii) the goods were packed to withstand the normal rigors of transport; (iii) that there were no transportation events involving the cargo (other than the derailment); (iv) no exceptions were taken to the condition of

the containers or their contents at point of rail carriage; (v) the derailment was not caused by inherent vice or act of shipper; (vi) that the derailment severely damaged the 40-foot containers in which the Shipment was carried; and (vii) from the type of damage it is self-evident the damaged condition resulted from the derailment. Plaintiffs incorporate by reference their Rule 56.1 Counter-Statement below (pars. 17-29 with referenced Exhibits).

21.    Plaintiff has never disclosed the identity of any individual with knowledge of the condition of the Auto Parts Shipment at rail origin, nor has plaintiff produced any evidence of any inspection of the freight inside the containers when the containers were tendered for domestic rail transport. Plaintiff's Rule 26(a) Initial Disclosures at ¶ 1 – A, attached as Exhibit L to Gambone Declaration.

Response: Disputed.  Plaintiffs' Initial Disclosures identified Yang Ming (Ex. L to Gambone Declaration).  Moreover, defendants were well aware from the Initial Disclosures in the related *Sompo* case of the existence of BNSF on this subject (Ex. E to Howard Dec.).  Yang Ming was subpoenaed and confirmed there were no other incidents involving the cargo other than the derailment (Ex. 3, Williams Dep., Tr 8-9).

27.    Plaintiff has never disclosed the identity of any expert to testify on any issue in this matter. Gambone Declaration at ¶ 18.

Response: Not disputed; as given the state of the unrefuted and obvious evidence and admissions, no expert evidence is needed.

## COUNTER-STATEMENT OF FACTS

### Enplas Claim

1.    Enplas Corporation is in the business, *inter alia*, of manufacturing and shipping automobile parts from its factory located in Tochigi, Japan (Kasamatsu Dec., par. 1).

2.     Enplas prepares invoices and packing lists in the ordinary course of its regularly conducted business activity of selling and shipping autoparts.  These types of document are prepared every time autoparts are shipped from the factory.  The documents reflects the type, quantity and price charged to Enplas USA of the Autoparts being shipped (Ex. 1 to Eagan Declaration--Kasamatsu Dec., par. 2 and Ex. A thereto).

3.     The products manufactured by Enplas are not made available to ship to its customers unless they have passed all inspection standards at the factory.  Since the parts are intended for use in automobile engines, the inspection standards are especially rigorous, with accuracy down to units of micrometers.  Before shipment, all pieces of manufactured products are inspected piece by piece with precise measuring instruments.  As automotive parts are precise components, manufacturing errors of even a single micrometer are set aside.  Such standards are followed every time, including during the testing of the Autoparts at issue.  Any damage which occurs during loading of the container also requires the product to be set aside and not shipped (Ex. 1, Kasamatsu Dec., par. 3).

4.     The "Container Carry In Report" for the Autoparts at issue in this litigation shows the container YMLU 4361427was received by the carrier Yang Ming in good order and condition since no adverse remarks are listed (Ex. 1 - Kasamatsu Dec., par. 4 and Ex. B thereto).

5.     Enplas packs its autoparts to withstand the normal rigors of transport.  The Autoparts at issue in this litigation were so packed (Ex. 1 - Kasamatsu Dec., par. 5; Ex. 2, Widmer Dep., Tr 26).

6.     Yang Ming issued a bill of lading to the shipper for the Enplas Shipment at place of receipt in Nagoya, Japan; no exception is taken to the condition of the container or its contents (Ex. B to Gambone Dec.).  Yang Ming admitted it is a "clean" bill of lading (Ex. 3, Tr 23).

7.    In response to subpoena, Yang Ming confirmed that the Enplas container (YMLU 4361427) was not involved in any incident from the time of receipt in Japan until the time of the derailment (Ex. 3, Williams Dep., Tr 8-9).

8.    Container YMLU 4361427 was involved in the derailment; Norfolk Southern was unable to further use the container as a result of the derailment and had to load the Enplas cargo into another container to continue the transit (Ex. 4, pars. 3 and 4).

9.    Many of the Autoparts at issue were for use in the carburetor (Ex. 1, Kasamatsu Dec. and Ex. A thereto).  The good order of carburetor parts is of particular concern because a malfunction can lead to stalling of the engine or fire (Ex. 2, Widmer Dep., Tr 11-12).

10.    The Enplas cargo was inspected at destination in Georgia in the container NS utilized to ship the goods from the derailment site to Georgia (Ex. 2, Widmer Dep., Tr 24).  The stow of the cartons by Norfolk Southern was haphazard with no blocking/bracing securing the Autoparts at issue inside the container (Ex. 2, Widmer Dep., Tr 22-23).  The cartons all appeared to be deformed, dented, impacted, or crushed, to a greater or lesser degree (Ex. 3, Tr 23).

11.    Other cargo in the container consisted of leaking bags of resin (not part of this claim)(Ex. 2, Widmer Dep., Tr 24).  Enplas was greatly concerned with contamination of the resin, dirt and debris on the other cargo in the container and of goods and equipment within its facility (Ex. 2, Widmer Dep., Tr 24).

12.    Inspection of a representative carton of carburetor parts found the goods damaged (Ex. 2, Widmer Dep., Tr 24).

13.    The cost to perform full inspection on the Autoparts cargo would have far exceeded the value of the goods.  That is, the cost to test the shipment would have exceeded $1 million. (Ex. 2, Widmer Dep., Tr 34-36; Ex. 5, Survey Report, p. 18).

14.    The CIP value of the damaged Enplas cargo was approximately $138,000 (Ex. 1, Kasamatsu Dec. and Ex. A thereto; Ex. 2, Widmer Dep., Tr 36).

15.    The Enplas Autoparts were unusable because they no longer met quality standards (Ex. 5, p. 17; Ex. 2, Widmer Dep., Tr 27).

16.    Enplas' underwriter paid Enplas $147,717 regarding the damaged parts. NipponKoa, on behalf of its assured Nippon Express (the freight forwarder who issued a bill of lading to Enplas) paid $100,000 to Enplas' underwriter in settlement of the cargo claim as a result of the derailment (Exs. 6 and 7).

**OOZX Claim**

17.    Fuji OOZX, Inc. ("OOZX") is in the business, *inter alia*, of manufacturing and shipping engine parts in Shizoka, Japan (Ex. 8, Imai Dec., par 2).

18.    OOZX creates invoices and packing lists every time it ships engine parts, and did so for the Engine Valves at issue in this litigation (Ex. 8, Imai Dec., and Exs. A and B thereto). OOZX issued these documents as part of its regularly conducted business activity.  The documents reflect the type, quantity and price of the Engine Valves shipped (Ex. 8, Imai Dec., par 3).

19.    OOZX does not ship its products to customers until the products have passed all factory inspections.  Products for use in automobile engines are subject to especially rigorous inspections.  The parts at issue were subject to such rigorous inspection.  If any damage is found while loading the container, the items are set aside and not shipped (Ex. 8, Ryouchi Imai Dec., par 4).

20.    The OOZX Engine Valves were in good order and condition at the time of loading (Ex. 8, Ryouchi Imai Dec., par 4).

21.    The Engine Valves were vanned into the container TEXU 4763735 in good order and condition (Ex. 8, Ryouchi Imai Dec., par 1 and Exs. A, B and C thereto).

22.    The Engine Valves were well-packed with care taken so no damage would occur in transport (Ex. 10, Daugherty Dep., Tr 20-21; Ex. 9, Survey Report at p. 182).

23.    Yang Ming issued a bill of lading to the shipper for the OOZX Shipment at place of receipt in Nagoya, Japan; no exception is taken to the condition of the container or its contents (Ex. G to Gambone Dec.).  Yang Ming admitted it is a "clean" bill of lading (Ex. 3, Williams Dep., Tr 23).

24.    In response to subpoena, Yang Ming confirmed that the OOZX container (TEXU 4763735) was not involved in any incident from the time of receipt in Japan until the time of the derailment (Ex. 3, Williams Dep., Tr 8-9, 18).

25.    Container TEXU 4763735 was involved in the derailment; Norfolk Southern was unable to further use the container as a result of the derailment and had to load the OOZX cargo into another container to continue the transit (Ex. 4, pars. 7 and 8; Ex. 12; Ex. 3, Williams Dep., Tr 23).

26.    At destination in Knoxville, Kentucky, the OOZX cargo which had been originally loaded in Container TEXU 4763735 (but re-loaded by Norfolk Southern into different containers) was surveyed.  Many of the boxes were dented; most pallets were not the original pallets as when shipped; and many cartons were not blocked or braced in the container (Ex. 9, Crawford Report; Ex. 10, Daugherty Dep., Tr 15-35).

27.    To summarize the inspection:

| Part No. | No. of Cartons inspected: | Sound: | Damaged: |
|---|---|---|---|
| A9690 | 48 | 7 | 41 |
| A9691 | 72 | 31 | 41 |
| A9693 | 72 | 5 | 67 |

| A9694 | <u>108</u> | <u>24</u> | <u>84</u> |
| Total | 300 | 67 | 233 |

(Ex. 9, p. 183)

28.     OOZX USA performed detailed inspection and testing of the items.  Ultimately the quantity of damaged parts was found to be $1,492.30, with inspection costs totaling $38,250.35 (Ex. 11, Crawford Report at pp. 37-38; Ex. 2, Widmer Dep., Tr 75-76).

29.     OOZX received a payment of JY 5,108,444 from its insurance company, NipponKoa Insurance Co., Ltd., for the loss at issue (Ex. 8, Imai Dec., par 1 and Ex. D).  As of April 18, 2007 (date of loss) the U.S. equivalent was $43,190.90.

**Facts Common to Both Claims**

30.     The derailment was not caused by an act of God, act of shipper, public enemy, inherent vice, or public authority (See from the related *Sompo* case: Ex. 11, Defendants' response to Request for Admission, par. 9).

Dated: Rye, New York
      April 30, 2009

Respectfully Submitted,

MALOOF BROWNE & EAGAN LLC

By:  s/Thomas M. Eagan
    David T. Maloof (DM 3350)
    Thomas M. Eagan (TE 1713)
411 Theodore Fremd Ave., Suite 190
Rye, New York 10580
(914) 921-1200

*Attorneys for Plaintiffs*

F://WP-Docs/2309.78/042809 Resp to 56.1.doc