RECEIVED by the Carrier from the Merchant in apparent external good order and condition (unless otherwise noted herein) the total number of Containers, or if the Goods are not shipped in Containers, the total number of packages or other shipping units specified in the box marked "No. of Pkgs. or Containers" for Carriage subject to all the terms and conditions hereof (including the terms and conditions on the reverse hereof and the terms and conditions of Carrier's applicable Tariff) from the place of receipt or the port of loading, whichever is applicable, to the port of discharge or place of delivery, whichever is applicable. If required by the Carrier, this Bill duly endorsed shall be surrendered in exchange for the Goods or Delivery Order.
In accepting this Bill, the Merchant agrees to be bound by all the stipulations, exceptions, terms and conditions on the face and back hereof, whether written, typed, stamped or printed, as if signed by the Merchant, any local custom or privilege to the contrary notwithstanding, and agrees that all agreements or freight engagements for the shipment of the goods are superseded by this Bill.

1. DEFINITION

The following words whether contained on the front or back have the meanings hereby assigned:

(1) "Bill" means (A) Bill of Lading if this document is issued as a Bill of Lading, or (B) Sea Waybill if this document is issued as a Sea Waybill. Notwithstanding anything else contained in or incorporated into this Bill, if it is issued as a Sea Waybill, it will not be a document of title to the Goods.
(2) "Carriage" means the whole or any part of the operations and service undertaken by the Carrier in respect of the Goods covered by the Bill.
(3) "Carrier" means the party on whose behalf this Bill is issued, as well as the Vessel and/or her Owner, demise charterer (if bound hereby), the time charterer and any substituted or Underlying Carrier whether any of them is acting as carrier or bailee.
(4) "COGSA" means the United States Carriage of Goods by Sea Act, approved on April 16, 1936.
(5) "Clean" means for Shipper's packed and sealed containers received in apparent good order and condition. In no circumstance a representation is made as to the weight, contents, measure, quantity, quality, description, condition, marks or value of the Goods thereof.
(6) "Container" includes any ISO standard container, trailer, transportable tank, flat rack and/or other item of transportation equipment in conformance with ISO standards.
(7) "Freight" includes all charges payable to the Carrier in accordance with the applicable Tariff and this Bill, including storage and demurrage.
(8) "Goods" means the whole or any part of the cargo received from the Merchant and includes any equipment or Container(s) not supplied by or on behalf of the Carrier.
(9) "Hague Rules" means the provisions of the International Convention for the Unification of Certain Rules Relating to Bills of Lading signed at Brussels on 25th August, 1924 and includes any amendments thereto including the Hague-Visby Amendments, 1968.
(10) "Holder" means any Person for the time being in possession of this Bill (if issued as a Bill of Lading) to whom the property in the Goods has passed on, or by reason of the consignment of the Goods or the endorsement of this Bill or otherwise.
(11) "Merchant" includes the shipper, Holder, consignee or receiver of the Goods or any Person owning or entitled to the possession of the Goods or this Bill and anyone acting on behalf of any such Person.
(12) "Multimodal Transport" arises if the Place of Receipt and/or the place of Delivery are indicated on the face hereof in the relevant spaces.
(13) "On Board" means the Goods are loaded On Board the ocean Vessel named in this Bill, or loaded On Board any of the first mode of transportation used or procured by the Carrier, or loaded on the facilities of any Underlying Carrier or Sub-Contractor for Carriage in accordance with the terms of this Bill.
(14) "Person" includes an individual, group, company or other entity.
(15) "Port-to-Port" arises if the Carriage is not Multimodal Transport.
(16) "Sub-Contractor" includes owners and operators of Vessels (other than the Carrier), stevedores, slot chartered owners, terminal and groupage operators, Underlying Carrier, road and rail transport operators and any independent contractor employed by the Carrier in performance of the Carriage.
(17) "Underlying Carrier" includes any water, rail, motor, air or other carrier utilized by the Carrier for any parts of the transportation the shipment covered by this Bill.
(18) "Vessel" includes the Vessel named on the face hereof together with any ship, craft, lighter, barge, feedership, ferry or other means of transportation substituted in whole or in part, for the Vessel named on the face hereof.

2. CARRIER'S TARIFF.

The terms and conditions of Carrier's applicable tariff are incorporated herein, including those provisions relating to Container and vehicle demurrage. Copies of the relevant provisions of the applicable tariff are obtainable from the Carrier upon request. In the event of any inconsistency between this Bill and the applicable Tariff, this Bill shall prevail.

3. MERCHANT'S WARRANTY

The Merchant warrants that in agreeing to the terms hereof he is, or has the authority of, the person owning, or entitled to possession of the Goods and this Bill.

4. EXEMPTIONS AND IMMUNITIES OF SERVANTS, AGENTS, STEVEDORES AND OTHER SUB-CONTRACTORS.

(1) The Carrier shall be entitled to sub-contract the whole of any part of Carriage on any terms whatsoever.
(2) In contracting for the following exemptions and limitation of, and exoneration from, liability, the Carrier is acting as agent and trustee for all other Persons named in this clause. It is understood and agreed that, other than the Carrier, no Person, firm or corporation or other legal entity whatsoever (including the Master, officers and crew of the vessel, agents, Underlying Carriers, Sub-Contractors and/or any other independent contractors whatsoever utilized in the Carriage) is, or shall be deemed to be, liable with respect to the Goods as Carrier, bailee or otherwise. If, however, it shall be adjudged that any Person other than the Carrier is Carrier or bailee of the Goods, or under responsibility with respect thereto, then all exemptions and limitations of, and exonerations from, liability provided by law or by the terms in this Bill shall be available to such Person.
(3) It is also agreed that each of the aforementioned Persons referred to in the preceding clause are intended beneficiaries, but nothing herein contained shall be construed to limit or relieve from liability to the Carrier for acts arising or resulting from their fault or negligent.

5. SCOPE OF THE VOYAGE

The intended carriage may include the use of Underlying Carriers and it is expressly agreed that the use of such Underlying Carriers shall not constitute a deviation. In this regard, the Carrier may at any time, and without notice to the Merchant, use any means of carriage or storage whatsoever, transfer the Goods from on conveyance to another, including transshipping or carrying the Goods on a Vessel other than that specified on the face hereof, proceed by any route in Carrier's discretion (whether or not the nearest or most direct, customary or advertised route) and proceed to, or stay at any place or port whatsoever, load and unload the Goods at any place or port (whether or not such port is named on the face of this Bill as the port of loading or the port of discharge) and store the Goods at any such place or ports, and/or comply with any orders or recommendations given by any government or local authority or any Person or body acting or purporting to act on behalf of such government or local authority.
The liberties set out in this clause may be invoked by the Carrier for an purpose whatsoever, whether or not connected with the Carriage of the Goods, including loading or unloading other goods, bunkering, undergoing repairs, adjusting instruments, picking up or landing any Persons, (including but not limited to Persons involved with the operation or maintenance of the Vessel) and assisting Vessel(s) in all situations. Anything done in accordance with this clause or any delay arising therefrom shall be deemed to be within the contractual Carriage and shall not be a deviation.

6. LIBERTY CLAUSE

If at anytime the Carriage is, or is likely, to be affected by any situation which has given, or is likely to give rise to danger, injury, loss, delay, risk of capture, seizure or detention, or disadvantage of whatsoever nature to the Vessel, the Carrier, any Underlying Carrier or Sub-Contractor utilized in the Carriage of the Goods, or if such situation makes it in any way unsafe, impracticable or unlawful or against the interest of the Carrier or the Merchant to commence or continue the Carriage of the Goods, the Carrier may, at any time, in its sole discretion:

(1) Unpack the Container(s) or otherwise dispose of the Goods in such way as the Carrier may deem advisable at the risk and expense of the Merchant;
(2) Carry the Goods to the contracted port of discharge or place of delivery, whichever is applicable, by any alternative route or means of transportation to that indicated in this Bill or that which is usual for Goods consigned to that port of discharge or place of delivery and any such additional Freights and charges shall be for the Merchant's account;
(3) Suspend the Carriage of the Goods and store them ashore or afloat upon terms of this Bill and endeavor to forward them as soon as possible, but the Carrier makes no representations as to the maximum period of suspension of the Carriage. Any additional Freight or charges shall be for the account of the Merchant; or
(4) Abandon the Carriage of the Goods and place them at the Merchant's disposal at any place or port which the Carrier may deem safe and convenient, whereupon the Carrier's responsibility in regard to the goods shall cease. Notwithstanding the abandonment, the Carrier shall nevertheless be entitled to full freight on the goods, and the Merchant shall pay any additional costs of the carriage to, and delivery and storage at such place or port.

The situations referred to in this Clause 6 shall include, but shall not be limited to, those caused by the existence or apprehension of war, whether declared or undeclared, hostilities, warlike or belligerent acts or operations, riots, civil commotions or other disturbances, storm, flood, earthquake or any other act of God; closure of, obstacle in or danger to any canal; blockade of port or place of interdict or prohibition of restriction on commerce or trading; quarantine, sanitary or other similar regulations or restrictions; strikes, lock outs or other labor troubles whether partial or general; congestion of port, wharf, sea terminal, or the facilities of any Sub-Contractor or Underlying Carriers used in the Carriage covered by this Bill.

7. CARRIER'S RESPONSIBILITY AND CLAUSE PARAMOUNT.

(1) Port-to-Port Shipment - when loss of damage has occurred between the time of loading the Goods by the Carrier, or any Underlying Carrier, at the port of loading the time of discharge by the Carrier, or any underlying Carrier, at the port of discharge, the responsibility of the Carrier shall be determined in accordance with Hague Rules or any national law making the Hague Rules, or any amendments thereto including the Hague-Visby Amendments, compulsorily applicable to this Bill. The Carrier shall be under no liability whatsoever for loss of, or damage to, the Goods, however occurring, if such loss or damage arises prior to loading on to, or subsequent to the discharge from, the Vessel. Notwithstanding the foregoing, in the event that any applicable compulsory law provides to the contrary, the Carrier shall have the benefit of every right, defense, limitation and liberty set forth in the Hague Rules as applied by this Clause during such additional compulsory period of responsibility. Notwithstanding the preceding provision, in the event that this Bill covers shipments to or from the United States, then COGSA shall be compulsorily applicable and shall (except as may be otherwise specifically provided elsewhere herein) also govern before the Goods are loading on and after they are discharged from the Vessel provided, however, that the Goods at said times are in the actual custody of the carrier or any Underlying Carrier or Sub-Contractor.
(2) Multimodal Transport –
(A) With respect to Multimodal Transportation from, to, or within the United States, when the Goods are in the custody of the Carrier, or any Underlying Carrier, such Multimodal Transport will be governed by the provisions of Clause 7(1).
(B) In the event Clause 7(1) is held inapplicable to such Multimodal Transportation from, to or within the United States then the Carrier's liability will be governed by and be subject to the terms and conditions of the Underlying Carrier's Bill and/or, where applicable, the ICC Uniform Bill of Lading together with the Underlying Carrier's Tariff which shall be incorporated herein as if set forth at length. Notwithstanding the foregoing, in the event there is a private contract of Carriage between the Carrier and any Underlying Carrier, such Multimodal Transportation will governed by the terms and conditions of said contract which shall be incorporated herein as if set forth at length and copies of such contract(s) shall be available to the Merchant at any office of the Carrier upon request.
(C) With respect to all water Multimodal Transport outside the United States where COGSA is not compulsorily applicable, then the Hague Rules shall apply as per Clause 7(1).
(D) With respect to road Carriage between countries in Europe, liability shall be determined in accordance with the Convention on the Contract for the International Carriage of Goods by Road ("CMR"), dated May 19, 1956; and during rail Carriage between countries in

11. SPECIAL CONTAINERS AND PERISHABLE GOODS.

Unless specially requested by the Merchant in writing, the Carrier is not required to provide anything other than a 20 or 40 foot standard dry Container(s). In the event the Carrier agrees to carry the Goods in a special Container(s) such as a refrigerated, heated or insulated Container(s). Goods of a perishable nature shall be carried in such dry Container(s) without special protection, services or other measures unless it is noted on the reverse side of this Bill that the Goods will be carried in a refrigerated, heated, electrically ventilated or otherwise specially equipped Container(s). The Merchant is required to give written notice of requested temperature settings of the thermostatic controls before receipt of the Goods by the Carrier. When a loaded Container(s) is received, the Carrier will verify that the thermostatic controls are set to maintain Container(s) temperature as requested. The Merchant is responsible for bringing the Goods to the proper temperature before loading the Goods into the Container(s), for the proper stowage of the goods within the Container(s), for setting the temperature (including maintenance and repair) during all times before the Container(s) are delivered to the Carrier and after they are delivered by the Carrier. The Carrier is not responsible for produce deterioration caused by inherent vice, defects in the merchandise or transit times in excess of the produce shelf life. The Merchant is specifically advised that refrigerated, heated, specially ventilated or otherwise specially equipped Container(s) are not equipped to change the temperature of Goods, but solely to maintain the temperature as received from the Merchant. The Carrier is unable to determine whether the Goods were at the proper temperature when they were loaded into the Container(s) or when the Container(s) was delivered to the Carrier. Carrier shall be deemed to have fulfilled its obligations under this Bill, and shall have no liability whatsoever, if the goods are carried in a range of plus or minus 2.5 degrees centigrade (4.5 degrees Fahrenheit) in regard to any carrying temperature designated in writing by the Merchant in this Bill.
Goods subject to deterioration or damage by extremes of heat and/or cold which are shipped by Merchant in standard dry Container(s) rather than in refrigerated or temperature controlled Container(s), which can be supplied by the Carrier, are carried at Merchant's risk and Carrier assumes no liability whatsoever resulting from Merchant's acts or omissions in failing to request the proper Container(s).

12. STOWAGE ON DECK

(1) The Carrier has the right to carry the Goods in Container(s) on deck, whether the Container(s) are owned or leased or have been packed or stuffed, by or on behalf of the Merchant or the Carrier. When Goods in Container(s) are carried on deck, the Carrier is not required to specially note, mark or stamp any statement of on deck carriage on the face hereof, any custom to the contrary notwithstanding. The Goods so carried shall be subject to the applicable legislations as provided for in the Cause Paramount hereof.
(2) Notwithstanding clause 12(1) above in the case of Goods which are stated on the face hereof as being carried on deck and which are so carried, the Hague Rules shall not apply and the Carrier shall be under no liability whatsoever for loss, damage or delay, howsoever arising.

13. LIVE ANIMAL, PLANTS AND PERISHABLE GOODS

The Carrier shall not be responsible for any accident, disease, mortality, loss of or damage to live animals, birds, reptiles, fish, plants and perishable Goods arising or resulting from any cause whatsoever including the Carrier's negligence or the Vessel's unseaworthiness, and shall have the benefit of all the provisions of this Bill.

14. DANGEROUS GOODS AND CONTRABAND

(1) The Carrier undertakes to carry the Goods of an explosive, inflammable, radioactive, corrosive, damaging, noxious, hazardous, poisonous, injurious or dangerous nature only upon the Carrier's acceptance of a prior written application by the Merchant for the Carriage of such Goods. Such application must accurately state the nature, name, label, and classification of the goods as well as the method of rendering them innocuous, with the full names and addresses of the Merchant.
(2) The Merchant shall undertake to ensure that the nature of the goods referred to in the preceding paragraph is distinctly and permanently marked and manifested on the outside of the Goods and Container(s) and shall also undertake to submit the documents or certificates required by any applicable statutes or regulations or by the Carrier.
(3) Whenever the Goods are discovered to have been received by the Carrier without complying with the foregoing or the Goods are found to be contraband or prohibited by any law or regulations of the port of loading, discharge or call of any place or waters during the Carriage, the Carrier shall be entitled to have such Goods rendered innocuous, thrown overboard or discharged or otherwise disposed of at the Carrier's discretion without compensation and the Merchant shall be liable to indemnify the Carrier against any kind of loss, damage or liability including loss of freight, and any expenses directly or indirectly arising out of resulting from such Goods.
(4) The Carrier may exercise or enjoy the right or benefit conferred upon the Carrier under the foregoing whenever it is apprehended that the Goods received in compliance with the terms of this clause may seem likely to become dangerous to the Carrier, Vessel, Goods, Underlying Carriers, Sub-Contractors, Persons and/or other property. The Carrier has the right to inspect the contents of the Container(s) and the Goods carried therein at any time and anywhere without the Merchant's agreement and at the risk and expense of the Goods.